### Clyde H. FORBES
### v.
### JENNEY MANUFACTURING COMPANY.
### Civ. A. No. 53–31.

United States District Court
D. Massachusetts.

Nov. 15, 1954.

Joseph Aborn, Stanley M. Epstein and Paul Keenan, Boston, Mass., for plaintiff.

Thomas H. Walsh, Boston, Mass., for defendant.

ALDRICH, District Judge.

The defendant's motion for new trial raises troublesome questions. The plaintiff in February, 1950, shipped as second mate on the tanker Charles S. Jenney, leaving of his own accord in September, 1951. The Jenney carried petroleum products from Lake Charles, Louisiana, to Boston. For some years, both before and after the plaintiff signed on, it had been the custom for each mate in rotation to take the entire discharge duty at Boston—a duty which ran 24 plus hours. This meant one trip on, two off, instead of standing sea watches in port like the rest of the crew. There were some complaints about this— not that the mates wanted sea watches, but that they wanted a relief mate from

5:00 P. M. to 8:00 A. M. so that they could have every trip ashore. This request was not granted.

Prior to shipping on the Jenney the plaintiff served as second mate on the Plymouth, a collier, for four years. Here, too, the mates rotated the discharge duty. On colliers the discharge took about 30 hours, but it was interrupted by an eight hour suspension of activities during the night.

There was no evidence that the plaintiff or anyone else suffered any ill effects from such lengthy duty, beyond temporary fatigue, until the events here in question.

On February 2, 1951, at Lake Charles, the plaintiff was on watch during the loading from midnight until the ship sailed at 9:40 A. M. The temperature was cold for Louisiana, at one time descending to 15°. The plaintiff's evidence indicates that he at least partially froze his toe. While the plaintiff says he "believes" he may have reported this to the first mate, the evidence satisfies me that he did not.

When the ship next reached Boston it was the plaintiff's turn to take the discharge duty. As a result he was on duty from 11:00 A. M. February 8th to noontime February 9th. He then stood his regular watch on the bridge until 4:00 P. M. I exclude the last hours from consideration, because they were to a considerable extent inside duty.

The night of February 8–9 was windy and very cold, the temperature at one time descending to 2° below zero. About 2:00 A. M. the plaintiff discovered that his toe seemed frozen again. He reported this to no one, but continued to work until the following noon. At that time the other officers came aboard and the plaintiff says he asked for relief from his bridge duty but did not get it.

The plaintiff did mention this second occurrence to the first mate, but never put it in the log, or reported it to the Captain, the proper person to whom to report injuries. He sought no medical attention until June or July. He was then advised by the hospital to return for treatment, but although the ship was laid up he did not do so. He did nothing further until December 1951, when as a result of an injury on another ship his leg had to be amputated below the knee. There was evidence that the injury sustained on the Jenney was the proximate cause of this amputation. He now wears an artificial limb.

The evidence further showed that in February, 1951 the plaintiff had Buerger's disease, an unusual disease of the blood vessels having some connection with tobacco. Smoking causes the vessels, particularly of the outer extremities, to contract, thereby cutting down the blood supply. It is a progressive disease and may eventually of itself lead to amputation. However, external causes, of which freezing is particularly effective, may hasten this result, or produce it in combination with the disease where neither alone would have been sufficient. Persons having this disease are particularly susceptible to freezing.

The plaintiff in February 1951 had no knowledge that he had Buerger's disease, and neither had anyone else. Although there was medical testimony that the length of the exposure to the cold, and fatigue, increases one's susceptibility to freezing, there was no direct evidence that a ship owner in the position of the defendant had reasonable grounds to anticipate freezing by the plaintiff as a result of his tour of duty on February 8–9. We are dealing not with indoor workers, cf. Stewart v. United States Shipping Board, Emergency Fleet Corporation, D.C.E.D.N.Y., 7 F.2d 676, but with seamen who are accustomed to considerable exposure. The practice of a lengthy discharge duty had been in effect for a long time and there is no evidence anyone had ever suffered any injury, or complained of such. It may be noted that the relief mate set-up which the officers had been requesting involved itself a duty from 5:00 P. M. to 8:00 A. M. on the part of the relief mate, which was almost exactly the length of time it took for the

plaintiff's toe to freeze. I find it very difficult, therefore, to predicate any negligence on the part of the defendant. The defendant was "not bound to guard him against highly improbable harm." Fournier v. Central Taxi Cab, Inc., Mass., 118 N.E.2d 767, 768.

This difficulty is further borne out by the fact that the plaintiff, an experienced officer of many years standing, did not himself see any occasion to warn the defendant of possible injury to himself, and as the duty officer in charge of the ship acquiesced in the same duty, which he claims to be hazardous, by the new pumpman. The pumpman, who came aboard at noon on February 8, 1951, testified that he and the plaintiff were together all the time, except at mess, and that this was with the plaintiff's approval. The pumpman made a good appearance and I fully credit his testimony.

I am not, however, quite prepared to say that the jury could not find any negligence on the part of the defendant. It may be that they were warranted in finding that it should have foreseen a possibility of harm to the plaintiff. However, I cannot entertain this without naturally reaching the conclusion that the plaintiff's own contributory negligence far out-distanced that of the defendant in not complaining, or advising it of his peculiar susceptibility indicated by his experience the week before. Furthermore, the plaintiff was extremely lax, assuming that his testimony as to his injury is accepted, which I must, in not reporting the matter afterwards to the defendant and seeking medical attention. The plaintiff ate with the Captain nearly every day, but never mentioned the subject to him in the seven months he remained on board, although he now says he suffered pain from time to time until he left the ship. The plaintiff argues that it is speculative how much benefit medical attention would have accomplished, but much of the plaintiff's evidence distinguishing between the effect of Buerger's disease and the injury was equally speculative.

This brings me to the question of damages. The jury found $33,000. The plaintiff argues, persuasively so far as I am concerned, that this figure in the light of his expectancy and past earnings, is very low if there were no question of contributory negligence involved. At the time of his injury he was 42 years old. He was earning $5,600 a year. He is presently earning something less than half that amount. If there were no question of contributory negligence I would not consider touching this verdict. In the light of all of the circumstances, however, I believe that it is greatly excessive, and I shall allow the defendant's motion for a new trial unless the plaintiff files a remittitur of all damages above $20,000. This is not what I would myself have found, but is the maximum I feel I can permit to stand. The plaintiff to have 10 days to file.

If I am wrong in my opinion that the jury could find negligence by the defendant, of course, I should allow the motion for new trial without qualification.

The defendant's motion for entry of judgment for the defendant is denied.